## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 17 2018, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

M.A.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Thomas G. Hungar
General Counsel

Todd B. Tatelman
Deputy General Counsel
Washington, D.C.

IN THE
# COURT OF APPEALS OF INDIANA

M.A.,

*Appellant-Respondent,*

v.

H.H.,

*Appellee-Petitioner.*

December 17, 2018

Court of Appeals Case No.
18A-PO-793

Appeal from the Marion Superior Court

The Honorable Angela Dow Davis, Judge

Trial Court Cause No.
49G16-1801-PO-189

**Altice, Judge.**

[1] H.H. works in the office of United States Representative Andre Carson (Congressman Carson), who represents the seventh congressional district of

Indiana. M.A. is a constituent of Congressman Carson. While at events related to her job, H.H. had contacts with M.A., after which she sought and obtained an order of protection in her favor against M.A.

[2] M.A., pro se, appeals the trial court's issuance of a protective order, raising five issues that we consolidate and restate as:

>  I. Whether H.H. produced sufficient evidence that M.A. stalked her;

>  II. Whether the order for protection violates M.A.'s rights under the First Amendment; and

>  III. Whether the trial court abused its discretion when it denied M.A.'s motion for recusal.

[3] We affirm.

## Facts & Procedural History

[4] H.H. is and was at all relevant times a Veterans Representative Liaison for Congressman Carson and worked at his district office located in Indianapolis. As part of her duties, H.H. handled veterans' affairs within the community, which included attending veterans-related meetings and events in the district. When H.H. began her employment as the Liaison, Congressman Carson's office had a policy in place that required M.A., when he visited Congressman Carson's office, to remain in the lobby of the office building (Lobby) where a staff member would meet him to discuss matters in the presence of security personnel. That arrangement was instituted because a previous caseworker at

Congressman Carson's office "did not feel comfortable with [M.A.] on her floor" even if security was present. *Transcript Vol. II* at 20.

[5] In the course of her Liaison duties, H.H. interacted with M.A. in March, April, and May 2017 in the Lobby, as well as at various community events in April 2017, and at a picnic event in June 2017. H.H. and M.A. also exchanged phone calls regarding veterans' matters. During some of their face-to-face interactions, H.H. perceived M.A.'s demeanor, language, and physical presence at times to be verbally combative and physically intimidating.

[6] On December 19, 2017, H.H. had an encounter with M.A. at the monthly meeting of the Mayor's Advisory Council for Veterans at the Marriott East Hotel in Indianapolis. Specifically, at the meeting, M.A. asked to speak with H.H. privately concerning what he perceived as a sensitive issue involving Congressman Carson. H.H. agreed, and M.A. "guided" H.H. out of the meeting room and then asked H.H. if she knew about "the rumored slush fund that is set up in Congress for members to use in sexual misconduct investigations." *Respondent's Exhibit* 3. M.A. began to "tower over" H.H. with his hands raised and gesturing. *Id.* Feeling uncomfortable with the situation, H.H. placed her hand on his raised forearm, at which time M.A. became "very agitated," told H.H. not to put her hands on him, and he waved his pointer finger in H.H.'s face. *Id.* H.H. told M.A. that she "refuse[d]" to have "yet another" conversation of this type, and she walked back into the meeting room. *Id.* M.A. followed her, and they exchanged words. H.H. tried to "sort of hide behind" some people, and an individual escorted H.H. to her car, where she

noticed that M.A. had walked out to the parking lot as well. *Id.* Following the interaction, H.H. spoke with law enforcement, and an informational incident report was prepared.

[7] On January 3, 2018, H.H. filed an ex-parte petition for an order of protection and request for hearing. She alleged that at the December 19 event, M.A. "harassed & yelled at [her]," used "racially degrading phrases," and "[w]ouldn't calm down even after third parties intervened." *Appellee's Appendix Vol. II* at 6. On January 25, 2018, the trial court held an ex-parte hearing on H.H.'s petition. H.H. testified that, on at least seven occasions prior to the December 19 encounter, M.A. had been in Congressman Carson's office and was "aggressive and combative" with H.H. and was "erratic." *Transcript Vol. II* at 5, 7. At the conclusion of the hearing, the trial court issued an Ex Parte Order for Protection, finding that M.A. represents "a credible threat to the safety of [H.H.]" and that H.H. "has shown, by a preponderance of the evidence, that . . . stalking has occurred sufficient to justify the issuance of this Order" *Appellee's Appendix Vol. II* at 12.

[8] M.A. filed a request for a hearing, which the trial court held on February 22, 2018. At the beginning of the hearing, and at the trial court's request, H.H.'s counsel summarized H.H.'s contacts with M.A. to support her request that the protective order remain in place, stating that on numerous occasions H.H. had had contact with M.A. that made her feel unsafe, intimidated, and in fear. M.A. exhibited the same type of general behavior each time, namely being in close physical proximity to H.H., yelling, and waving his hands in her face.

Those encounters included meeting with M.A. in April and May in the Lobby, another encounter in June at an office picnic event, and the December 2017 incident. Counsel stated that H.H. was asking only "to keep [M.A.'s] physical presence away from the office," not to preclude M.A. from access to constituents' services, noting that M.A. "would still be permitted to attend public events" and that M.A. could continue to contact Congressman Carson's Washington D.C. office. *Id*. at 15-16.

[9]     H.H. testified at the hearing that she had communicated with M.A. fifteen to twenty times on the phone and seven times in person within the last year. She opined that at times M.A. would pose questions, not to get answers or engage in "meaningful conversation," but rather "in order for him to yell at you." *Transcript Vol. II* at 5, 7. H.H. described that in face-to-face conversation M.A. would use his body to "tower[] over" her. *Id*. at 43. She said that when M.A. would "snap," "[her] emotions go from uncomfortable to terrified." *Id*. H.H. also described the December 19 encounter with M.A., where he was "leaning into [her] as a way to kind of tower over [her]" and that when she placed her hand on his raised forearm, "he got very agitated." *Id*. at 59. When H.H. then returned to the meeting room to gather her belongings, M.A. followed her and told her that her response was what he expected of her, calling her "you little girl." *Respondent's Exhibit* 3. H.H. said to others who were present, "[G]et him away from me." *Transcript Vol. II* at 67. H.H. testified that the December encounter with M.A. was "the final straw" and that she was "genuinely afraid" to be in the office because of him. *Id*. at 43.

[10] M.A. testified that, during their private conversation at the Marriott, H.H. pushed him and then ran back into the conference room. He told the court that when H.H. said "get him away from me," M.A. then stated, "[N]o, get her away from me . . . She's the one that put her hands on me." *Id.* at 67, 68, 70. During his testimony, M.A. urged that "[i]f there's an assault it was her assaulting me[,]" stating that he was "afraid of [H.H.]," as she was "trying to assassinate [his] character with a falsehood" and that he had sought a protective order against H.H., but it was denied. *Id.* at 69.

[11] During the hearing, M.A. made an oral motion for the trial judge to recuse herself, alleging that, at the prior ex-parte hearing, the trial judge had "guided" H.H., "prompted" her with her testimony, and was "biased." *Id.* at 39. M.A. asserted to the trial court, "You represented her." *Id.* The trial court denied the motion. M.A. raised the issue again, and the trial court again denied his request for recusal.

[12] At the conclusion of the hearing, the trial court determined that H.H. had proven that M.A. made her feel threatened and that stalking had occurred, noting in its decision it had considered "the number of times that [M.A.] went to places where [H.H.] works." *Id.* at 79. The trial court advised M.A. that he was prohibited from having any contact with H.H. at her home and at her place of employment and that he was not to call the local office of Congressman Carson and was to contact the Washington D.C. office instead. The court's written order found that M.A. "represents a credible threat to [H.H.]'s safety" and that H.H. "has shown, by a preponderance of the evidence, that . . .

stalking has occurred sufficient to justify the issuance of [an] Order." *Appellant's Appendix Vol. II* at 2. The trial court issued a one-year protective order (i) enjoining M.A. "from threatening to commit or committing acts of … stalking… against [H.H.]," (ii) prohibiting [M.A.] "from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with [H.H.]," and (iii) ordering [M.A.] to "stay away from the residence … and/or place of employment of [H.H.]" *Id.* The Order specifically provided that M.A. "may send all mailings and calls to the Washington DC office for [Congressman] Carson." *Id.*

[13] M.A. filed a motion to correct error, which the trial court denied. M.A. now appeals.

# Discussion and Decision

## A. Sufficient Evidence

[14] Under the Civil Protection Order Act (the Act), "[a] person who is or has been a victim of domestic or family violence[1] may file a petition for an order for protection[.]"Ind. Code § 34-26-5-2(a). The petition for protection may be sought against, as is relevant here, a person who has committed "stalking," as defined in the criminal code. *Id.*; *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct.

---

[1] The definition of "domestic or family violence" includes stalking as defined in Ind. Code § 35-45-10-1, whether or not the stalking is committed by a family or household member. I.C. § 34-6-2-34.5; *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct. App. 2010).

App. 2010). The Act authorizes issuance of an order for protection where a petitioner shows stalking occurred, regardless of who has committed it. *See Parkhurst v. Van Winkle*, 786 N.E.2d 1159, 1161-62 (Ind. Ct. App. 2003) (noting that "for purposes of [the Act], stalking . . . need not be committed by a family or household member to constitute 'domestic or family violence'"). To obtain an order of protection, the petitioner must establish at least one of the allegations in the petition by a preponderance of the evidence. *A.S.*, 920 N.E.2d at 806. A finding that domestic violence has occurred sufficient to justify the issuance of a protective order means that a respondent represents a credible threat to the safety of a petitioner or a member of the petitioner's household. I.C. § 34-26-5-9(f).

[15] In granting a petition for a protective order the trial court must sua sponte make special findings of fact and conclusions thereon. *Costello v. Zollman*, 51 N.E.3d 361, 365 (Ind. Ct. App. 2016), *trans. denied*. We apply a two-tiered standard of review:

> [W]e first determine whether the evidence supports the findings, and then we determine whether the findings support the order. In deference to the trial court's proximity to the issues, we disturb the order only where there is no evidence supporting the findings or the findings fail to support the order. We do not reweigh evidence or reassess witness credibility, and we consider only the evidence favorable to the trial court's order. The party appealing the order must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them de novo.

*S.B. v. Seymour Cmty. Schools*, 97 N.E.3d 288, 295 (Ind. Ct. App. 2018) (quoting *Fox v. Bonam*, 45 N.E.3d 794, 798-99 (Ind. Ct. App. 2015) (internal quotations and citations omitted)), *trans. denied*.

[16] M.A. contends that H.H. did not present sufficient evidence that he committed stalking. Stalking is defined by I.C. § 35-45-10-1 as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Harassment, in turn, is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress," but does not include constitutionally protected activity. I.C. § 35-45-10-2. Impermissible contact "includes but is not limited to knowingly or intentionally following or pursuing the victim." I.C. § 35-45-10-3. The term "repeated" in the context of Indiana's anti-stalking laws means "more than once." *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1078 (Ind. Ct. App. 2011) (quoting *Johnson v. State,* 721 N.E.2d 327, 332-33 (Ind. Ct. App. 1999), *trans. denied*), *trans. denied*.

[17] M.A. does not dispute that the contacts occurred. Rather, he argues H.H. failed to identify specific dates, other than the December 19 encounter, and, further, he maintains that "any contact is clearly consensual because [H.H.] has the option to engage in a conversation or not," noting that, in the last contact in

December 2017, "[H.H.] was invited to engage in a private conversation to which she could have declined." *Appellant's Brief* at 13. M.A. asserts that "[t]he contact is coincidental at best and certainly is not a pattern." *Id.* at 12. Contending that H.H. "provided no evidence" that he stalked her, M.A. asserts that the protective order was not warranted. *Id.* We disagree with M.A.'s characterization of the evidence.

[18] H.H. presented evidence that, in addition to fifteen to twenty phone conversations, H.H. had face-to-face interaction with M.A. on at least seven occasions in the last year, some in the Lobby and others at events, during which M.A. engaged in a similar pattern of behavior that was physically and verbally intimidating to her. He would lean in or tower over her, wave his arms and hands, and act in a combative and aggressive way. H.H. said that M.A. was "erratic" and she described that when he would "snap" her emotional gauge would move from uncomfortable to "terrified." *Transcript Vol. II* at 43.

[19] During the December 2017 incident, which was the "last straw" for H.H., M.A. asked H.H. to speak with him outside of the meeting room. She agreed, and he guided her out of the room. He then spoke to her about an alleged Congressional "slush fund" for members to use for sexual investigations. When H.H. indicated she was not aware of it, M.A. retorted, "well of course not huh[.]" *Respondent's Exhibit* 3. H.H. advised M.A. that she refused to engage in "yet another" conversation with M.A. where he towered over her and waved his finger in her face, and she went back into the meeting room to gather her belongings. *Id.* M.A. followed H.H. back into the room and continued to

speak to her, calling her "you little girl." *Id.* H.H. "sort of hid behind" other people in the room, accepted an offer to be escorted to her car, and once there, observed that M.A. was also in the parking lot. *Id.* She thereafter contacted law enforcement to report the incident. H.H. testified that she was "genuinely afraid" to go to work because of M.A. *Transcript Vol. II* at 43.

[20] In M.A.'s view, he "has the right to voice his opinion on any matter he pleases and in what ever tone he pleases and in whatever demeanor he pleases and in whatever stance he pleases." *Id.* at 20. The law provides otherwise. M.A. cannot engage in a knowing or intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened. We conclude that the trial court did not abuse its discretion in concluding that M.A. repeatedly engaged in conduct with H.H. that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and, in fact, caused H.H. to feel the same. M.A. has failed to carry his burden to show that the order for protection is not supported by sufficient evidence.

### B. Constitutionally Protected Activity

[21] M.A. correctly observes that stalking does not include statutorily or constitutionally protected activity. *See* I.C. § 35-45-10-1. M.A. claims that his conduct was constitutionally protected, as he "has a right to contact his congressperson for matters pertaining to his interests, benefits or concerns as a veteran or as a constituent of Andre Carson." *Appellant's Brief* at 11. M.A.

appears to be arguing that the protective order infringes on his First Amendment rights. We, however, are not persuaded.

[22] M.A. generally asserts that he has a federal constitutional right to petition the government for redress of grievances, and that on those occasions when M.A. was speaking to H.H., he was permissibly addressing grievances.[2] U.S. Const. amend. I provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[23] While M.A. does have a right to address grievances pertaining to his interests and benefits with his Congressman, the protective order issued by the trial court does not preclude him from doing so. The protective order specifically provides that M.A. "may send all mailings and calls to the Washington D.C. office for [Congressman] Carson." *Appellant's Appendix Vol. II* at 2. Further, at the hearing, the trial court explained to M.A. that "[t]he Court is not prohibiting you from having any access to your Congressman" and that it was only prohibiting him "from having any contact with [H.H.]." *Transcript Vol. II* at 79.

---

[2] We note that M.A. cited to the U.S. Constitution and raised a federal claim, but he did not assert any independent analysis under the Indiana Constitution. He has thus waived any state claim. *See Sandleben v. State*, 29 N.E.3d 126, 132 (Ind. Ct. App. 2015) (finding that defendant raised claim that his conduct was constitutionally protected under the Indiana Constitution but waived federal claim by failing to provide an independent analysis under federal constitution), *trans. denied*.

The court also offered to provide the address and phone number of Congressman Carson's Washington D.C. office to M.A.

[24] M.A. argues that he "has the right to have a face-to-face conversation with his congressperson . . . and this protective order takes away his right to do so in Indianapolis." *Appellant's Brief* at 12. Contrary to his claim, M.A. does not have a constitutional right to a face-to-face conversation with Congressman Carson. "[T]he right to petition government does not include the absolute right to speak in person to officials." *Stengel v. City of Columbus*, 737 F.Supp. 1457, 1459 (S.D. Ohio 1988); *see also, Jaeger v. Cellco P'ship*, 936 F. Supp. 2d 87, 97 (D. Conn. 2013) ("[t]he right to petition the government for redress of grievances includes the right to file lawsuits as well as the right to pursue administrative grievances" but "does not include the absolute right to speak in person to officials"), *cert. denied* 135 S.Ct. 78 (2014).

[25] To the extent that M.A. claims that his conversations with H.H. were constitutionally protected because they, to whatever degree, concerned issues related to Congressman Carson and/or veterans' affairs, and therefore the protective order should not have been issued, we reject his argument. As we determined above, M.A. was not free to repeatedly talk to H.H. in a manner that caused her to feel intimidated, afraid, or terrified. M.A.'s conduct crossed the bounds of constitutionally protected activity. We find that the one-year protective order did not violate M.A.'s First Amendment rights.

## C. Recusal

M.A. argues that the trial court erred when it denied his motion for recusal that he made during the hearing on the protective order. A judge's decision about whether to recuse is reviewed for an abuse of discretion. *L.G. v. S.L.*, 88 N.E.3d 1069, 1071 (Ind. 2018). An abuse of discretion occurs when the judge's decision is against the logic and effect of the facts and circumstances before it. *Id.*

Ind. Judicial Conduct Rule 1.2 provides that "a judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Jud. Cond. R. 2.11 further provides that a "judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." The inquiry is not whether the judge personally believes himself or herself to be impartial, but whether a reasonable person aware of all the circumstances would question the judge's impartiality. *In re Wilkins*, 780 N.E.2d 842, 845 (Ind. 2003). The law presumes that a judge is unbiased and unprejudiced. *L.G.*, 88 N.E.3d at 1073. To overcome this presumption, the moving party must establish that the judge has personal prejudice for or against a party. *Id.* Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before him or her. *Id.*

Here, at the hearing that took place on February 22, 2018, M.A. made an oral motion asking the trial judge to recuse herself, alleging that the judge had

shown partiality at the prior, ex-parte hearing. M.A. relies on the following exchange at the ex-parte hearing between H.H. and the court:

> H.H. Yes, there's no meaningful conversation that comes from it. He - I'm short, I'm 5'2" so kinda like everyone towers over me but, he does it in a way where he intentionally scoots closer and closer and closer to me as a way of just towering over me and making me feel kind of small. And our security guards at our office building noticed it that first interaction so he's no longer allowed in our building since that interaction.

> THE COURT: Okay. Did he ever threaten you?

> H.H.: Not verbally, no, but he does get very aggressive and combative.

> THE COURT: So, do you believe he's stalking you?

> H.H.: No, but there are--many events-

> THE COURT: It has to be a yes or I can't give you a Protection Order.

> H.H.: Oh, I'm sorry.

> THE COURT: In order to get-

> H.H.: Yes.

> THE COURT: -a protective order, you either have to be in a relationship or it's stalking.

H.H.: Yes.

THE COURT: So, if you never had a date with him or didn't have a relationship with him, didn't have a child with him, I can't give it to you. But, if you feel like he's - and that's what you put on here, is that you felt you were a victim of stalking.

*Id.* at 5-6. The exchanged continued, with H.H. telling the court that M.A. had harassed her seven times in the last year. *Id*. at 6.

[29] Based on this dialogue at the ex-parte hearing, M.A. sought the judge's recusal because he believed that the trial court "guided" H.H. and "represented" H.H. at the ex-parte hearing. *Id.* at 39, 40. The trial court disagreed and denied the motion for recusal. M.A. argues on appeal that the trial judge should have granted his motion for recusal because the court "advised [H.H]. to change her answer" when the trial court asked H.H. if she believed M.A. was stalking her, and it thereby represented H.H. at the hearing. *Appellant's Brief* at 21. While we acknowledge that the trial court's use of the words "[i]t has to be a yes or I can't give you a Protection Order" might, when read in isolation, appear to be directing H.H. how to reply, we find that, when that statement is read in its full context, the trial court was not instructing H.H. on what her testimony should be or otherwise representing her. As explained below, M.A.'s lens is too narrow and disregards the remainder of the exchange.

[30] A reading of the full dialogue between the trial court and H.H. at the ex-parte hearing reveals that the trial court was asking questions of H.H. – who was unrepresented – to determine what had occurred between her and M.A. and

during that process explained to H.H. under what circumstances a protective order may be issued. Specifically, after H.H. testified that M.A. used his physical size and presence to make her "feel kind of small" and would become "aggressive and combative" and "yell" at her, the trial court asked H.H. if she believed M.A. was stalking her. *Transcript Vol. II* at 5. Although H.H. initially replied "no," she also began to refer to "many events," and it was at this moment that the trial court interjected the challenged "it has to be a yes or I can't give you a protective order" statement. *Id.* at 6. Immediately thereafter the trial court explained to H.H. that in Indiana that a protective order may be obtained in two circumstances, namely when (1) the parties are in a relationship, or (2) stalking has occurred. *See* I.C. § 34-26-5-2(a). We agree with H.H. that it was "appropriate for the trial judge to take steps to ensure that [H.H.] was providing accurate testimony on the basis of a proper understanding of the legal significance of the term 'stalking' as used by the judge." *Appellee's Brief* at 20. Based on the record before us, we find that M.A. has failed to demonstrate that a reasonable person aware of all the circumstances would question the trial judge's impartiality. The trial court did not abuse its discretion when it denied M.A.'s motion for recusal.

[31] Judgment affirmed.


Brown, J. and Tavitas, J., concur.